HEARD APRIL TERM, 1877.

## *Ex Parte* SMITH.

A decision of a Circuit Judge under a writ of *habeas corpus* discharging a prisoner from the custody of the Superintendent of the Penitentiary on the ground that he had been pardoned by the Governor is appealable to the Supreme Court.

A Governor holds his office until his successor is chosen and qualified, unless he has, by formal resignation or other act equivalent thereto, resigned or abandoned the office, or has, by his own conduct, estopped himself from holding over.

A candidate for Governor who receives the highest number of votes, whose election has not been contested, and who qualifies in the presence of the House of Representatives and of such of the Senators as choose to attend, after notice to the Senate, is the duly elected and qualified Governor of the State and entitled to discharge the functions of the office.

Under the Constitution and laws of this State, the title to an office held by election of the people depends upon the fact of the election, and not upon the acts or omissions of Boards of State Canvassers; and when such fact is shown by any competent authority and the election is not contested, the person who has received the highest number of votes is, under the Constitution, entitled to the office.

The failure of the Secretary of State to deliver the returns of the Managers of Election for Governor to the Speaker of the House of Representatives, as he is required to do by Article III, Section 4, of the Constitution, cannot deprive the person who has received the highest number of votes of his right to the office. The fact that he did receive the highest number of votes may be ascertained in some other way,—as, for instance, from the returns of the Managers of the Election on file in the offices of the Clerks of the different Counties.

Where an election for Governor is not contested, the *prima facie* result of the election as shown by the returns of the Managers must be accepted as the true legal result and acted upon accordingly.

No provision of the Constitution or Act of the General Assembly requires that a Governor elect shall be *installed* before entering upon the duties of his office. All that is required is that he shall be *qualified* by taking and subscribing the oath of office prescribed by the Constitution; and although it is eminently proper and suitable to the dignity of the occasion that all the usual ceremonies should be observed, such ceremonies are not essential to the legal validity of a qualification.

One may abandon, renounce or resign an office by act as well as by word. Where, therefore, one has been elected Governor and holds the office for two years and until his successor has been chosen and qualified, and, being a candidate for re-election, is defeated, but claims the office and qualifies as if he had been elected, such claim and qualification is a renunciation of his right to hold over; and if he cannot maintain his title to the office under the second election, he must be treated as if he had resigned it.

Where one holding the office of Governor is a candidate for re-election, and, being defeated, goes through the form of inauguration as if he had been re-elected, he is estopped by such conduct from afterwards admitting his defeat and claiming the office under a provision of the Constitution giving him the right to hold over until his successor is qualified.

BEFORE CARPENTER, J., AT RICHLAND, 1876.

This was a petition by Peter Smith for a writ of *habeas corpus.* The material facts were that in December, 1876, the petitioner was a prisoner in the custody of the Superintendent of the Penitentiary, under sentence of the Court of General Sessions for a criminal offense of which he had been convicted. On the 20th day

of that month he received from D. H. Chamberlain, claiming to be Governor of the State, a paper, under the great seal of the State, purporting to be a pardon. The Superintendent refused to recognize the paper as a valid pardon, and this was an application to the Court for a discharge of the prisoner.

His Honor Judge Carpenter made an order for the discharge of the prisoner, and this was an appeal to the Supreme Court from that order.

*Maxwell*, for the State, filed the following printed argument :

It is submitted that, apart from the question as to whether Wade Hampton has been qualified as provided by law, he must, nevertheless, be regarded as *de facto* Governor.

1. Having received the highest number of votes cast at the last general election, he has the *de jure* title, and is in the actual discharge of the functions of the office.

2. If Daniel H. Chamberlain, his competitor, did not receive the highest number of votes, his only *color* of title must be derived from his right to hold over by virtue of Section 2, Title III, of the Constitution.

3. He has surrendered such right.

I propose in this argument to confine myself to the consideration of the third proposition.

It is claimed that in the event of an adjudication by this Court that neither of the rival candidates for the office of Governor has been lawfully declared elected and duly inaugurated, nevertheless Chamberlain is entitled to the office in pursuance of Section 2, Article III, of the Constitution.

This Section provides that the Governor shall hold over until his successor shall be chosen and qualified.

The reverse of this proposition is true.

It is submitted that by the record in this case it appears that on the 7th day of December, Chamberlain, claiming to have been elected at the last general election, and claiming to have been duly declared to have received the highest number of votes, thereupon, by a public and notorious act, assumed to take the oath of office as such Governor elect, and submitted himself to a ceremony which he publicly avowed was an inauguration or induction into the said office under the title thereto claimed to have been derived from

such election and declaration. Subsequently thereto, in accordance with the custom in the case of a newly-inaugurated Governor, he wrote and published an address, which he represented to be his inaugural address, and which averred his assumption of the duties of said office by virtue of the title claimed to have been derived from said general election.

What is the legal construction of these acts?

It is respectfully submitted that Mr. Chamberlain, in assuming to clothe himself with the insignia of office as Governor by virtue of his claim to have received the highest number of votes at said election, in submitting himself to a ceremonial of inauguration, and in taking an oath of office as said pretended Governor elect, were equivalent to a surrender or resignation of all right and title to such office by virtue of his preceding term.

A resignation is defined by Bouvier to be the act of an officer by which he declines his office and *renounces* his further right to use it.—Bouvier's Law Dictionary.

And such resignation need not be by any particular form of words.—Dillon on Municipal Corporations, 200.

It may be by parol.—26 N. Y., 325.

The act of resignation is an act of the will. It may be manifested in any way which precludes the idea of any other purpose. · It would be absurd to say that when Mr. Chamberlain assumed to enter upon the duties of the office in question under the *new* title he at the same time retained the idea or intention to continue to hold under the *old*. It was optional with him to choose between these two; nay, it was an absolute necessity that he should so choose, unless it can be said that there can be two good titles to the same office existing at the same time—an absurdity plain upon its face. If, then, Mr. Chamberlain knew when he assumed to take possession of his office under the new title that he could not in the same breath assert a claim to such office under any other title, we have at once two courses of action presented to him, involving the necessity of a choice. A question is presented, to decide which he must, from the very necessity of the case, exercise his volition. He does exercise it. He says, in so many words, "I prefer this title rather than the other." He had the option of determining which one of two titles he would accept, and he chose the one which he thought gave him the longer lease of power. By this very act, therefore, he manifests an intention upon his part to relinquish the

former title. It could not be otherwise, unless one can be said to select one of two things or one of two courses of action and at the same time retain that which has not been selected, which would involve a *reductio ad absurdam*. Before he can assume to act under the latter title he must abandon all claim to the other. Mr. Chamberlain, in assuming to submit to the ceremony of inauguration, and in entering upon the duties of the office by virtue of that ceremony, in so many words said to the people of this State that he had abandoned all right which he had to the office by virtue of that clause in the Constitution. He was at liberty to claim by one title or the other; that he has taken the one course is sufficient proof that he has given up the other. What is this but a resignation—a *laying down* of the title under the old term, which cannot be held conjointly and simultaneously with the new, since, as we have shown, a resignation is not any form of words, written or spoken, but such acts as evidence an intention to relinquish or abjure the office in question?

In the case of *The People* against *Metropolitan Police*, (26 N. Y., 325,) it was said that "affirmative acts on his part are quite as effective as affirmative words, either written or spoken."

In the same case it is held that a refusal to hold an office under a particular Act and to do what that Act requires amounts to a resignation, even when the duties were the same.—*Ibid*, 327; Dillon on Corporations, 200.

In the absence of any prescribed forms or acts, any facts which at common law would constitute an executed agreement would be sufficient; and the acts and declarations of the party may be received as evidence of the agreement.—*People* vs. *Metropolitan Police, supra*, 329.

"No case occurs to me," says the Court in the same case, "in which any office in the civil department of the government may not be vacated by the act of the incumbent alone."—*Ibid*, 330.

At page 332 of the same case the Court continues: "The relator refused to hold the office under this Act. What could he have done more effectually to divest himself of the office? *   *   *   *   * He had a right to disclaim all title to the office; and if, in fact, he *had* title, such disclaimer would be a resignation."—3 Hill, 248.

In these cases it will be seen the legal conclusion of a resignation is based upon the *intention* of the party, evidenced by acts which would be inconsistent with the fact of continuing to hold the office.

The important factor in the case is the *disposition* or *intention*, which is a question of fact. The incumbent in that case, as in this, did certain things of his own volition, from which a conclusion is drawn,—which is the only reasonable conclusion,—namely, that he must have contemplated a laying down or resignation of the title, which could not, from its very nature, have subsisted simultaneously with the one assumed.

If this reasoning be correct, it requires no extended argument to make it apparent that it could make no kind of difference whether the subsequent title was or was not what was anticipated, since the *intention* to forsake the former title and the exercise of the will in making a selection between that and the subsequent one must, necessarily, have *preceded* the actual assumption of the latter.

And the *intention* having been expressed and the will set in operation in making the selection, the resignation was instantly complete, irrespective of the validity or invalidity of the new acquisition.

When was this intention manifested? Certainly when the selection was made. It was then transformed into an *act*. Before the intention is thus declared it may be withdrawn or changed; but once *expressed*, it would be idle to say that it could still continue inchoate and inoperative until it was ascertained that the election had been unwise or that the choice had not resulted as expected.

*Millwood* vs. *Thatcher*, 2 T. R., 88: The question arose as to whether the acts of plaintiff, who, while holding the office of juror, had been elected Town Clerk, constituted a resignation.

The Court (Buller, J.,) said: "Then as to any option which the party may be said to have had, there cannot be a stronger instance of having made an option than the plaintiff accepting the office of Town Clerk and acting under it. I have no doubt his intention was to keep both offices; but if he be mistaken and choose to accept the last office, he must abide by the consequences, for it is his own act."

Grose, J.; same case: "I think the fact of his accepting the latter office will probably be considered as a resignation of the former."

But, again, in addition to the argument tending to establish a resignation of the former title to this office, drawn from the acts of Mr. Chamberlain, as evidencing his *intention* to yield up the claim based thereupon, it is submitted that, irrespective of this intention, the said acts operate in law as a resignation.

This proposition is based upon the rule of law that the act of accepting an office which is incompatible with the one then held by the incumbent works a resignation or surrender of the latter.

In the case of *The People* vs. *Carrique*, (2 Hill's N. Y., 98,) in which the defendant, who had been a Justice of the Peace under a certain Act, had been elected to a similar office under a subsequent Act, and was sought to be prevented from acting under his first title, upon the ground that he had accepted office and been sworn in under the subsequent Act, the Court (Cowen, J.,) says: "It is therefore said by continuing to act in the Justice's Court, this was rather an election to hold his first office, notwithstanding his accepting, taking the oath of office and entering on duties under the second. The contrary is entirely settled—that a resignation by implication may take place by being appointed to and accepting a new office incompatible with the former. This is an absolute determination of the former office and leaves not a shadow of title to the possessor."—Angell & Ames on Corporations.

"An office may be impliedly resigned or vacated by the incumbent accepting an incompatible office."—Dillon on Corporations, 200; *Burnett* vs. *Scribner*, 16 Bart., 621.

It is submitted that the offices which Mr. Chamberlain has attempted to exchange are, in their nature, incompatible and inconsistent. It will not do to say that the duties of each are identical. They are held by different titles. The authority by which the incumbent of each is enabled to discharge his functions are totally different in the two cases. The office which was abandoned was filled by a general election which took place in 1874. At the entrance of his career upon that office, Mr. Chamberlain took an oath of office covering that term. That office was terminable on the qualification of his successor, or sooner, at his pleasure. It could not afterwards exist. It was a grant of power which terminated necessarily when either of those events took place. The office upon which he assumed to enter on the      day of November last was, although the same in title, in all other respects a different office. He took upon himself new relations; he took a new oath of office; he went through the ceremony of a new inaugural.

The theory upon which the case in 2 Hill turns is, evidently, that the resignation was established not by any particular act of the incumbent, for none was shown except by entering upon another office, but by the *fact* that the two offices were incompatible. The

title and duties of the two offices in that case were identical, as in this, but they were essentially incompatible in the sense that they were held by different and distinct titles.

The term "incompatible" does not relate alone to the duties of the office, but to the term or title of the office.—6 Wend., 579.

In *People* vs. *Metropolitan Police*, (*supra*, 325,) it is said that "the duties of an office are things different and distinct from the office itself."

Therefore, while the *duties* of an office may be perfectly compatible with each other, as in the case at bar, and as in the case in 2 Hill, *supra*, it does not follow that the *offices* are so.

Mr. Chamberlain cannot claim to be acting under two titles to his office. He cannot claim, in the same breath, to be the Governor elect and the Governor holding over. The duties of the office may not be incompatible, but their term and title are.

That this reasoning is correct, and that the *dictum* laid down above that acceptance of incompatible office works resignation of former office, comprehends cases where the titles to the office are incompatible. See also *Ex Parte Gray*, Bail. Eq. Rep., (S. C.,) 87.

In *Lawrence* against *Brown*, (5 N. Y., 404,) it is said: "A surrender is worked when an estate incompatible with the one held is accepted by lessee, *as* when lessee takes a new lease of *same* lands."

This case is cited, not upon the particular question of surrender, (which will be discussed hereafter,) but to show that the "incompatibility" spoken of had no reference "to the duties or powers granted," but to the title by which the grant is derived.

There is no objection to an officer holding two or more offices at the same time when they can be discharged without interfering with each other; but how can it be pretended that a person may claim the right to hold the same office under two titles at the same time which are, from their nature, inconsistent? Either the one or the other must be invalid. There cannot be *two* perfect titles to the same office, any more than there can be two or more perfect titles to the same property. The grantee or lessee must derive his claim from the one or the other, and one or the other must fall to the ground. They are inconsistent with each other, and so "incompatible" from their very nature. Either Mr. Chamberlain must hold his office under or by virtue of his prior term, or else, separately and distinctly from that, by virtue of his re-election. It is absurd to say that he can hold under both at the same time. If

this be true, it certainly can need no further argument to show that the two offices are separate and distinct. It follows, as a logical conclusion, that before he can assume to act under the one he must abandon all claim to the *other*. What is this but a resignation—a giving up of the rejected office—without reference to his wish or intention?

Suppose that the person who went through this ceremonial of inauguration, instead of being the actual preceding incumbent, had been a different individual. We will suppose Mr. Chamberlain, however, present and assenting thereto,—taking part in the ceremony,—investing his successor with all the paraphernalia of the office, and proceeding to turn over to him the records and property in his custody as Governor. Mr. Chamberlain retires to private life, and the other proceeds to execute and discharge the duties of the office, (perhaps for months,) when it is ascertained that the newly-inaugurated gentleman was not elected and not entitled to hold the office. Will it be pretended that Mr. Chamberlain had not completely divested himself of all right and title to the office? Could he return to the executive office and begin again where he left off? Would there be any question in that case that he had surrendered his office? Upon no other theory could such an pretended ceremony take place. How, then, can the effect of it be changed merely because it happened to be *himself* to whom he resigned and transferred the office? The theory is the same. The process is identical. There must have necessarily been a surrender and giving up of the old title before the new one could be assumed, unless the paradox, as we have stated it, that a man may hold an office by virtue of two titles at the same time can be maintained.

Upon the question as to whether the acceptance of a subsequent office operates as a resignation of the former, it is believed that there has been no definite adjudication other than in the cases cited above. But there are a number of well-settled doctrines in cases which are clearly analogous and in which there can be no adverse argument derived from the idea of " incompatibility." Among these may be classed a long line of cases involving the surrender of leases. A brief reference to the nature and source of grants of this character may avail to make clear the analogy between the principle involved in the surrender of a lease and that of a surrender of an office.

Under the Roman law, the tenure by which lands, offices and franchises were held was identical. The land acquired by conquest was held by certain individuals, who had their villas or personal habitations and the land immediately attached thereto and culti-vated by them. The balance was leased to the freemen, who came to be termed farmers,—*villeins*,—and from among these the proprietor or lord of the soil appointed bailiffs and stewards, *even in large cities*. All the offices were derived from the proprietors of the land.—Introduction to Reeves's History of English Law, 11, Note 2.

"As the conquest progressed, the lands conquered were allotted to the Romans or lords of the soil, and they had the appointment to offices within their domain and the leasing of lands."—*Ibid*, 15, Note 3.

Even judicial offices were granted by the proprietors of the soil.

"The lords exercised judicial functions. They had their Courts of law, presided over by their appointees."—Introduction to Reeves's History, (*supra*,) 97, and Note 3.

"And the Saxons adopted the Roman laws and customs."—*Ibid*, 37.

."The feudal system derived from the Romans involved the na-ture of *territorial* property—the union of *sovereignty with property*—(the lord having sovereign rights within his domain) and the present system of legislation, which united the possession of feuds."—Gui-zot, Sect. Sur le Civ. en France, Section 2.

Subsequently the ultimate sovereignty in lands and offices became vested in England—in the crown. The title in either case eman-ated from that source, and, in this country, so continued, with certain modifications, down to the revolution, which resulted in establishing a form of government in which the fundamental theory is that the people are the sovereign. It is easy to trace the intimate relation-ship, as regards their origin and nature, of the two classes of grants—leases and offices. Even now, when the fee simple in lands is held by individuals, and leases, therefore, proceed from the individual owners, leaving only leases of office inherent in the people at large, the term "lease" is applied to offices granted by them, and it is customary to speak of such grants as "leases of office," thus, by the very use of the term, acknowledging its source and applicability to offices as well as lands.—Bailey's Eq. Rep., (S. C.,) 87.

Further to show the analogy, nay, the intimate relationship, be-tween leases of office and leases of land, it is said of the former

that they may be either for life, for years or at will.—7 Bacon's Abr., 307.

In the fifth volume of Bacon's Abridgment, offices and lands are spoken of indiscriminately under the head "of what a lease may be made for years." And no distinction is made as to the various rules applicable to leases in either case.—5 Bacon's Abr., 438, 439.

In a word, the analogy is clear. The lord was in all things the sovereign; now the people are the sovereign. Leases of lands and of offices were both derived from the lord. The origin of the title to lands and offices was, therefore, identical. As has been said, in our times, while the title to lands rests in individuals, the sovereignty being changed, leases of offices can come only from the people at large. They are identical in character and origin, albeit the source from which they emanate is no longer the same.

"The principles of every part of our law are to be found in their simple original forms—in the more ancient forms and proceedings. Though the *form* has changed, the principle endures."—Reeves, *supra*, 127.

That the analogy sought to be maintained is reasonable and complete is conceded by the learned Judge who decided the case below. If it can be maintained, the question of surrender involved in this case can be illustrated by a number of well-settled cases.

In *Lyon* vs. *Reed*, (13 M. & W., 285,) it is said that when a party takes a new lease for premises already held by him as tenant, the fact of his so doing is evidence that the new lease has been accepted by him, and such acceptance works a surrender in law.—8 Jur., 762.

"A surrender is said to be the yielding up of an estate for life or years to him who hath the immediate estate in reversion or remainder."—5 Bacon's Abr., 657.

But it is said that in order to have such an acceptance operate as a surrender, the subsequent lease must be valid.

This proposition, which seems to derive some support from two or three cases, is based upon an entire misconception of the reason which lies at the basis of the rule.

This is succinctly stated in Bacon's Abridgment, vol. 5, page 661, thus: "Because the grantor, having already made a lease, cannot make another while this is in existence."

In other words, it is a condition precedent to even assuming to give a new lease that the former should be surrendered. They cannot subsist together, and, consequently, the surrender is the very

first act on the part of the lessee,— performed before, and not after or even at the identical moment of, taking the new lease.   If surrendered, therefore, before the acceptance of the new lease, of what consequence is it, so far as the surrender is concerned, whether the subsequent lease be good or bad ?

And following this reasoning, the rule is laid down that "a lessee for life or years who takes a new lease of the same premises surrenders the first, though the second be *void*."—5 Bacon's Abridg., 663, and cases cited.

In the case at bar, Mr. Chamberlain, by accepting the new title, or assuming to act under it, *admitted the power of his lessor or grantor*, which power it could not legally have without a surrender of the first title.— *Van Rensselaer* vs. *Penniman*, 6 Wend., 579.

"The reason why an acceptance of a second lease works a surrender of the first is, that without the first is dissolved the latter could not be granted."—*Livingston* vs. *Ten Broeck*, 16 Johns., 29.

Suppose A makes a lease of land for ten years to B.   At the expiration of one year B agrees to give up this lease upon A's executing to him a second lease for four years.   The new lease is made out and the parties proceed to carry out their agreement.   Is it not plain that before B can receive the second lease, good or bad, he must give up the first?   Otherwise there would be two terms subsisting together.

The learned Judge below intimated that there was no authority in this country sustaining the doctrine as above stated in 5 Bacon, 663.   With all respect to him, he has overlooked a very strong authority directly in point, to which the attention of this Court is requested.

In the case of *Van Rensselaer* against *Penniman*, (6 Wendell, 579,) already cited, the principle was established in the Court of Errors of New York,—a Court which, it is but faint praise to say, has never been excelled in this country, either for the legal acumen of the Judges who composed it and whose names are illustrious in the annals of jurisprudence, or the patient and painstaking industry which characterized their decisions.   Composed of such men as Chief Justice Savage, Samuel Nelson, Ogden Edwards, Esek Cowen, Monell and Gardner, there can be no hesitation in yielding to their conclusions all the respect and obedience which is due to the most eminent legal authority.

The learned Chief Justice, (Savage,) at the outset, states the first and principal question to be whether the acceptance of the second lease was a surrender of the first. He then proceeds to say: "It seems to be well settled that if a lessee accepts a new lease of the same premises during the term of the first lease, the first is deemed to be virtually surrendered."

"The *reason* is that the acceptance of the new lease admits the capacity of the lessor to make such new lease, which he could not have without a surrender of the first lease."

"The doctrine of presumption is founded on the well known disposition of a man to enjoy his own. No man would take from another a lease of that which was already his own."

Did Chamberlain know that this office was his by virtue of the old title? Then why did he assume to take the new? Can his conduct be reconciled with the doctrine above stated?

The very fact of his assuming to take this new title involves his admission that he had given up all claim to the former, and this irrespective of the character of the new lease.

"And this," proceeds the case above cited, "is the consequence, *although the second lease should be void.*"

"The cases seem to have settled the point that *simply receiving a second lease* raises the presumption,"—namely, of a surrender of the first.

It is respectfully submitted, therefore, that the learned Judge who decided the case below was in error when he said that the doctrine (that such surrender was not good when the subsequent lease was void) "has been sustained by all the British Courts, and that the preponderance of authority in this country is largely adverse to the ruling said to have been made in *Mellows* vs. *May*," cited in 5 Bacon's Abr., *supra*. Not a single American case was adduced in support of this proposition of the learned Judge, and but two English cases are referred to by him, which I propose briefly to examine.

The first case cited by him is the case of *Zouch* vs. *Parsons*, 3 Burrows, 1807. "In this case an infant who was one of the heirs of a mortgagee of certain premises joined in a release of his interest on payment of the amount due, in order that the mortgagor might remortgage the premises to the grantors of the plaintiff. The infant's representatives sought to avoid this release and to reinstate the mortgage which had been released. The question was whether,

1st. .The release was void; and, 2d. If, being void, there was any surrender of the rights under the mortgage.

"The Court held that, the release being *voidable only*, the surrender of his interest under the mortgage was good."

Now, it will be seen at a glance that this case is not in point:

1. Because the question as to the effect of an acceptance of a *void* lease was not involved in the case.

2. Because it was not the case of a lease at all, but was simply a question as to whether the maker of a release had *himself* surrendered the thing he released, when such release was voidable.

It was as if an infant had bargained away certain rights, and the question was whether such rights *were* bargained away—the act of *bargaining* being voidable.

Is there anything in common between such a case and the case at bar?

The other case (4 Burrows, 1980,) is equally inapplicable as an authority. The question did not arise at all; but the reporter says:

"The Court held the second lease good; but they *seemed* to agree that the first would *not* have been surrendered if the second had been void."

These are the only cases cited by the Court below.

But suppose they were adopted as authority: What do they mean?

It will be noticed that in the language used in both cases the theory was that the first lease was surrendered "in order to" or "in consideration of" the new lease; that the acceptance of the new lease was on *condition* that it should be good. Will it be pretended that Mr. Chamberlain had any such *condition* in his mind when he publicly declared that he had been elected and went through the ceremony of inauguration? Did he not know all the qualities of this second lease before he took it? Was he not fully aware of all the questions involved which would make it either good or bad? Had he not been aware of all the processes by which this second lease was created, and was there, or could there have been, any question in his mind as to the legal effect of that lease? How, then, can it be said that he had in contemplation any *condition?* A condition can only be inferred where the party has not the absolute means of knowing whether what he assumes to take *upon* the condition is what he expected.

I repeat, therefore, that the effect of the acceptance of this office under the new title in Mr. Chamberlain's case, whether the new title prove to be good or bad, not only upon principle and sound reason, but upon authority, operated as a surrender of the old title.

But, again, when Mr. Chamberlain publicly had himself proclaimed, by virtue of a pretended election as Governor, he, in effect, said to every officer in the State acting under his instructions: "I this day renounce all title to this office by virtue of the provision permitting me to hold over until the qualification of my successor, and I now announce that what I do hereafter I do by virtue of my election as Governor for the succeeding two years." Such being the case he cannot now be heard to say that this pardon, which he thus impliedly assumed to grant by virtue of his being the re-elected Governor, was granted by him in virtue of his old title.

Suppose he had said personally to Colonel Parmele: "Sir, I grant this pardon as Governor, claiming to be such by virtue of the recent election." And suppose it is ascertained by Colonel Parmele that he was not elected, and consequently holding no title by virtue of such election, and he thereupon refuses, as he properly should, taking the same ground as that occupied by the pretended Governor, and knowing any pretense founded on such assumption to be false, and replies: "It would be unlawful for me to recognize this pardon since the title under which you claim is invalid. I have your own words that you claim under no other." Suppose an action of false imprisonment to be begun by the prisoner, and then Mr. Chamberlain comes into Court, or his grantee, who is privy with him, and asserts that this pardon was granted, *not* by virtue of his *pretended title*, nor upon the ground stated by him, but by virtue of *another* title. Would such a plea avail him in any Court of justice? Would he not, upon every principle of estoppel, be prevented from setting up such a claim? In Bigelow on Estoppel, it is stated that "*estoppel in pais* is an indisputable admission arising from the circumstance that the party claiming the benefit of the principle has in good faith been induced by the voluntary action of the other against whom it is [alleged to change his position."—Bigelow, 369, 475.

*Non constat* but that Colonel Parmele would have recognized and yielded obedience to the pardon but for the position taken by Mr. Chamberlain that he acted not under the *old* but under the *new* title. By publicly announcing his choice of this last title, he has

obliged Colonel Parmele, knowing this announcement to be without authority, to change his position. He has so spoken as to cause Colonel Parmele to take a stand which may result in an action against him by this convict for false imprisonment.

"*Estoppel in pais* arises: 1st. By an admission inconsistent with the evidence proposed to be given or *title proposed to be set up*. 2d. An action by the other party on such admission. 3d. An injury to him by allowing the admission to be disproved."—2 Smith's Leading Cases, 643.

In this case: 1st. Mr. Chamberlain made a public admission or avowal to all who were subject to his orders that he claimed to be Governor by virtue of this election. 2d. Colonel Parmele acted upon this admission ; for if Chamberlain had constantly after the election claimed to be holding over under the old title, his pardon might have been recognized. 3d. He has subjected himself to an action for false imprisonment, should Chamberlain or his grantees be permitted to disprove the admission.

But, again, Mr. Chamberlain is estopped upon another theory of the doctrine of estoppel,—namely, by his recitals.

"A party is estopped by his recital from showing that his title was derived in a different way."—Bigelow, 298.

"A widow by executing a release by which she styles herself 'widow and sole devisee' cannot deny that she took under her husband's will."—*Dundas* vs. *Hitchcock*, 12 How., 256 ; Bigelow, 297.

"When a man has entered into a solemn engagement, by deed or otherwise, as to certain facts, he shall not be permitted to deny any matter which he has asserted."—*Ibid*, 297.

In the case of *People* vs. *Metropolitan Police, supra*, it is said of the incumbent of the office in question : "He had a right to disclaim all title to the office ; and if, in fact, he *had* title, such disclaimer would estop him from denying that he had resigned."—Page 333.

When Mr. Chamberlain said that he accepted this office under the new title, he estopped himself from setting up a different title.

"A tenant is estopped from setting up a paramount title, either in himself or another, after he has accepted under a lease."—2 Smith's Leading Cases, 657.

Again, in treating of surrender by operation of law, it is said, in *Lyon* vs. *Reed*, (13 M. & W., 285,) that it occurs "when an act is done by the owner of a particular estate, the validity of which he would be estopped from disputing, and which could not have been done had the particular estate continued to exist."

In the present case the act done was inauguration, taking an oath of office, &c., which certainly could not have been done had not Chamberlain abandoned his former title.

And another case strong in point is reported in 6 M. & G., 673, cited in Bacon's Abridgment: "When a lessee for years accepts a new lease from his lessor, he is estopped from saying that his lessor had not the power to make a new lease; and as the lessor could not grant the new lease until the prior one had been surrendered, the acceptance of such new lease operates as a surrender of the former one."

*Lyon* vs. *Reed*, 13 M. & W., 285, &c.

But, again, it is said in the recognized treatise on estoppel which has been referred to: "That when a party has two inconsistent courses before him, he must elect between the two."

"He cannot occupy inconsistent positions."—Bigelow, 578, 579.

"And having chosen, he must abide by it."—*Ibid*, 536, 537, 544.

In the case of *Smith* vs. *Smith*, (14 Gray, 532,) defendant claimed title under a deed from the father of the parties, who, by his will, had devised the *locus* to the plaintiff and other property to *defendant*. Defendant had accepted the property under the will, but said he had *intended* to hold under the deed also, if the law would not let him have both.

The Court held that by accepting under the will he elected to hold under that title and could not go back and claim under the deed.

"If the exercise of an office can be attributed to two titles, one good and the other bad, it will be attributed to the *good* title, *unless the party exercising the office has disclaimed the good title.*"—*Reg.* vs. *Thomas*, 3 Nev. & P., 288; 2 Jur., 347; 7 Sergeant & Rawle, 372.

And to conclude: "Any decisive act of the party, done with a knowledge of his rights and of the facts, determines his election and works an estoppel."—Bigelow, 578.

Mr. Chamberlain did a "decisive act" when he took the oath of office and submitted to an inaugural ceremony. He had "knowledge of all the facts" and of his rights. None knew them better than he. His conduct, therefore, determined his election, and he is estopped from ever claiming under the other title.

*Elliott*, contra.

1877. The opinion of the Court was delivered by

McIv.ER, A. J.   This is an appeal from an order made by the Judge of the Fifth Circuit, discharging a prisoner from the custody of the Superintendent of the Penitentiary who had been brought before him under a writ of *habeas corpus*.   The prisoner based his application for a discharge upon a paper purporting to be a pardon, dated the 20th day of December, 1876, signed by D. H. Chamberlain as Governor of South Carolina.   The application was resisted solely upon the ground that the paper was not entitled to be respected as a pardon, because the person by whom it was signed was not at the time entitled to exercise the powers of Governor of the State.

A preliminary question has been suggested as to whether the order of the Circuit Judge discharging the prisoner is appealable; and this we must first dispose of.

We are not distinctly informed of the grounds upon which this question is raised, as this part of the case has been submitted without argument, and we have been furnished with no authorities on the point.   If it is placed upon the ground that this is practically an appeal on behalf of the State, and that the State cannot appeal in any criminal case, we are not prepared to give our assent to the proposition thus broadly stated.   It is very true that there are several cases which decide that a new trial will not be granted in a criminal case *where the defendant has been acquitted.—State* vs. *Riley*, 2 Brev., 444; *State* vs. *Wright*, 2 Tr. Con. Rep., 517; *State* vs. *Edwards*, 2 N. & McC., 13; and *State* vs. *Bowen*, 4 McC., 254. But in all these cases the appeal was *after the acquittal* of the defendant; and the reason given was, that if in such a case a new trial was granted, it would be in violation of the great principle of the common law, that no person should be twice put in jeopardy for the same offense.   This reason would not apply to the present case, for in the case of the *State* vs. *Fley and Rochelle* (2 Brev., 338,) it was contended that Rochelle, having been discharged from a former commitment for the same offense, for delay in the prosecution, under the 7th Section of the *habeas corpus* Act, could not be legally indicted and tried on the same charge; but the Court held otherwise, for the reason that such discharge could not, upon any sound principle, be considered as an acquittal, and the prisoner was accordingly tried and convicted.   Again, may not this appeal be

regarded as taken, not in behalf of the State, but in behalf of the Superintendent of the Penitentiary, the officer charged with the custody of the petitioner, whose duty it would be to see that, if the petitioner is discharged, the discharge should be legal? It is very obvious that this case does not belong to that class of cases of which *Carmand* vs. *Wall*, (1 Bail., 209,) *State* vs. *Friday*, (4 Rich., 291,) *State* vs. *Bowen*, (3 Strob., 573,) and *ex parte Bell* (14 Rich., 7,) furnish examples, in which it is held that where, by statute, jurisdiction has been conferred upon an inferior or special tribunal, no appeal is allowed from the decision of such tribunal unless the statute expressly secures the right of appeal. For if the jurisdiction exercised by the Circuit Judge in this case should be said to have been derived from the provisions of the *habeas corpus* Act, as incorporated in the General Statutes of this State, then, as we shall see presently, the right of appeal is therein expressly allowed. If, on the other hand, the jurisdiction exercised was derived from the common law, then it is plain that the principle decided by the above-mentioned cases does not apply.

Should the objection be based upon the ground that an appeal from the decision of a Circuit Judge in an application for the writ of *habeas corpus* is not allowed, we have only to refer to the cases of *ex parte Kottman*, (2 Hill, 363,) *ex parte Schumpert*, (6 Rich., 344,) and *ex parte Williams*, (11 Rich., 452,) in which such appeals have been entertained, and to the case of *ex parte Pereira*, (6 Rich., 149,) in which it was held that an appeal from the decision of a Circuit Judge refusing a writ of *habeas corpus* will not be heard if, before the application for the hearing of the appeal, the petitioner has been set at liberty and has gone beyond the jurisdiction of the Court, for the reason that it would be a nugatory proceeding. It is true that in none of these cases was the question now under consideration distinctly raised, but that very fact affords strong grounds for the inference that no doubt upon the question was entertained. In Pereira's case objection was made to hearing the appeal, and a motion submitted to strike the case from the docket of the Court of Appeals,—not, however, upon the ground that the case was not appealable, but on the ground that, the defendant being then beyond the jurisdiction of the Court, it would be a useless waste of time to proceed further with the case.

We think, however, that the question is settled by the provisions of Section 19, Chapter CVIII, General Statutes, p. 546, which is

in these words: "An appeal from *all* final decisions rendered on applications for writs of *habeas corpus* shall be allowed as is provided by law in civil actions."

If it should be contended that this provision only applies to cases in which the writ is issued under the *habeas corpus* Act and does not cover the case in hand, which does not come within the provisions of that Act, inasmuch as the prisoner is in custody under a charge of felony, we would answer that the terms used in the Section are very broad,—broad enough to cover both classes of cases. The language is "an appeal from *all* final decisions rendered on applications for writs of *habeas corpus*," &c., not from decisions on applications for the writ of *habeas corpus provided for by this Chapter or this Act.* There are no words in the Section implying that the Legislature intended to limit the right of appeal to any particular class of cases.

Again, when the Legislature, by Section 6, Chapter CV, General Statutes, p. 494, conferred upon "each of the Justices of the Supreme Court" the power to issue various writs, among others the writ of *habeas corpus*, we see that they were very careful to secure the right of appeal to "either party;" and when we find, in the case of *Braker* vs. *Knight*, (3 McC., 82,) Johnson, J., in speaking of the right of appeal, using such language as this: "From the first organization of a Court possessing appellate powers, it has, so far as I have been able to learn, been the usage of the Court to entertain appeals from all orders made at chambers which in their operation were conclusive as to the rights of the parties," followed by the equally strong language of O'Neall, J., in *Pinckney* vs. *Henagan*, (2 Strob., 255,) approved in the *State* vs. *Hunt*, (4 Strob., 339,) we are admonished that the right of appeal should not be abridged or denied, except where the law denying or abridging such right is very clear.

Turning, then, to the merits of the case, we find that the Circuit Judge, after reaching various conclusions of fact, (which it is unnecessary to state here in detail, as the facts which we regard as conclusive of this case are not controverted and will be hereinafter stated in their appropriate place,) found as conclusions of law: "1st. D. H. Chamberlain was not, on the 7th day of December last, legally installed as Governor of South Carolina. 2d. Wade Hampton was not, on the 14th day of December, 1876, legally installed into the office of Governor of said State. 3d. The attempted installation of D. H. Chamberlain being illegal and void, it did not

operate in law as a resignation of the office of Governor which he held at that time. As by the Constitution the Governor holds his office for two years, and until his successor is chosen and qualified, and as there has been no legal qualification of his successor, D. H. Chamberlain is lawfully in the possession of the Executive office and entitled to discharge the legal functions of the same until such qualification takes place."

It will be conceded, for the purposes of this case, that Mr. Chamberlain was entitled under the provisions of Section 2, Article III, of the Constitution to hold the office of Governor until his successor was "chosen and qualified," unless he had by formal resignation, or other act equivalent thereto, resigned or abandoned the office, or had by his conduct estopped himself from claiming to hold over under that Section.

It becomes necessary, therefore, to consider three questions: 1st. Had the successor of Mr. Chamberlain been "chosen and qualified" on the 20th December, 1876? 2d. Had Mr. Chamberlain, on the 20th December, 1876, resigned or abandoned the office of Governor which he had been holding for the preceding two years, by virtue of the election held in 1874? 3d. Had he estopped himself from claiming to hold over under the provisions of Section 2, Article III, of the Constitution of this State? An affirmative answer to either of these questions will show that the paper purporting to be a pardon can have no legal efficacy as such, and therefore that the circuit decision was erroneous and should be overruled. The first question has so recently undergone a thorough consideration in this Court, in the case of *ex parte Tilda Stephens,* alias *Tilda Norris,* and the conclusion then reached is so well sustained by the able and elaborate argument contained in the opinion of the present Chief Justice, that it would be a useless effort to attempt to add anything to it. But as the case involves the gravest of inquiries, it has been thought proper that we should state some of the reasons, without elaborating the arguments, which have led us to the conclusion heretofore announced in this case. There are certain facts bearing upon this question which are conceded on all hands, namely, that on the 7th November, 1876, an election was held, for the purpose, amongst other things, of choosing a successor to Mr. Chamberlain, the then incumbent of the office of Governor; that at such election there were but two persons voted for to fill that office—Wade Hampton and D. H. Chamberlain; that the re-

turns of the Managers of the election showed that Governor Hampton had received the highest number of votes; that the election was not contested; that on the 14th December, 1876, Governor Hampton qualified as Governor by taking the oath of office in the presence of the body of men which, by the recent decision of this Court in the case of *The State*, ex rel. *Wallace*, vs. *Hayne and Mackey*, had been determined to be the lawful House of Representatives of this State, and in the presence of such members of the Senate as saw fit to attend, upon an invitation sent to that branch of the General Assembly by the House of Representatives; and that immediately thereafter Governor Hampton entered upon the discharge of the duties of the office of Governor, in so far as he was not prevented by the refusal of Mr. Chamberlain, backed by the military power of the United States government, to surrender the office of Governor, and so continued until the 20th December, 1876, and afterwards. On this state of facts it is clear to our minds that at the time Mr. Chamberlain undertook to sign the pardon in question his successor had been "chosen and qualified." It is very obvious that in a government like ours, where the people are the source of all powers, that the title. to an elective office depends upon, and is derived from, the election—the choice of the people, as manifested at the ballot box; and that it cannot be made to depend upon the acts or omissions of individuals, whether assembled in the form of Returning Boards or Boards of State Canvassers, or by whatever other name they may be styled. Otherwise the choice of officers would not rest with the people, but with these Boards, which, viewed in the light of recent events, are regarded by some as devices contrived by the ambitious and unscrupulous to defeat, rather than to carry into effect, the choice of the people. Accordingly, we find in the Constitution of this State (Article VIII, Section 10,) a general provision declaring that "in all elections held by the people under this Constitution the person or persons who shall receive the highest number of votes shall be declared elected." And in Article III, Section 4, this general provision is applied specially to the election of Governor: "The person having the highest number of votes shall be Governor." Whenever, therefore, it is ascertained, by any competent authority, that a certain person has received the highest number of votes for the office of Governor, that person must, under the Constitution, be entitled to the office, unless the election is contested in the mode prescribed by law. Now, in this case, this

Court, invested with competent authority to determine the issues involved, one of which is whether any person, and, if so, who, was *chosen* Governor at the election in November last, sees the fact to be that, on the face of the returns of the Managers of Election, Governor Hampton has received the highest number of votes, and the result necessarily follows that, *prima facie,* he is the person whom the people have chosen Governor.

It is wholly unimportant to consider what conclusions the Board of State Canvassers reached, for it is admitted that they had no authority whatever to canvass the vote for Governor; and the fact that in canvassing the votes for other officers voted for at the same election they reached certain conclusions, could, at the very utmost, furnish only a presumption that the results which they had reached in reference to others would also be reached in reference to the office of Governor, provided we could persuade ourselves to adopt the same questionable mode of proceeding which they saw fit to do, to which we are very far from being inclined, and provided also that the vote for Governor was not essentially different from that for other State officers; but even then it would be very far from being conclusive. Indeed, to ask a Court of supreme jurisdiction to be governed by the decision of an inferior tribunal, composed not only of partisans but of persons, some of whom were directly interested in the result of the decision, is a proposition of so novel and extraordinary a character that it is difficult to treat of it in language becoming to a judicial opinion. It is said, however, that the only mode by which it can be ascertained who received the highest number of votes for Governor is pointed out in Article III, Section 4, of the Constitution, and unless that mode is pursued the fact never has and never can be legally ascertained. That Section of the Constitution is in the following words: "The returns of every election of Governor shall be sealed up by the Managers of Elections in their respective Counties and transmitted by mail to the seat of government, directed to the Secretary of State, who shall deliver them to the Speaker of the House of Representatives at the next ensuing session of the General Assembly, and a duplicate of said returns shall be filed with the Clerks of the Courts of said Counties, whose duty it shall be to forward to the Secretary of State a certified copy thereof, upon being notified that the returns previously forwarded by mail have not been received at his office. It shall be the duty of the Secretary of State, after the expiration of

seven days from the day upon which the votes have been counted, if the returns thereof from any County have not been received, to notify the Clerk of the Court of said County and order a copy of the returns filed in his office to be forwarded forthwith. The Secretary of State shall deliver the returns to the Speaker of the House of Representatives at the next ensuing session of the General Assembly; and during the first week of the session, or as soon as the General Assembly shall have organized by the election of the presiding officers of the two houses, the Speaker shall open and publish them in the presence of both houses. The person having the highest number of votes shall be Governor; but if two or more shall be equal and highest in votes, the General Assembly shall, during the same session, in the House of Representatives, choose one of them Governor *viva voce*. Contested elections for Governor shall be determined by the General Assembly in such manner as shall be prescribed by law."

It will be observed that the language of this Section is, not that the person having the highest number of votes shall be *declared* Governor, but that such person "shall be Governor." Inasmuch, however, as the word votes clearly means *legal* votes, the Section proceeds, after providing for a difficulty which might arise from two persons having the same number of votes, to provide a means of ascertaining whether the votes set down to one person or another were *legal* votes, by making provision for a contested election. The other provisions of this Section requiring the Managers of Elections to transmit the returns to the Secretary of State, who is required to deliver them to the Speaker of the House of Representatives, to be by him opened and published in the presence of both houses, are not essential to the validity of the election or the ascertainment of the result. The Section does not provide that the person *then* or *thus found* to have the highest number of votes shall be Governor, as it doubtless would have done if the intention had been to make these provisions essential. It is much more probable that these provisions were inserted for the purpose of informing the General Assembly *officially* whether the returns exhibited a result,—two persons having the same number of votes, which would render it necessary for them to take action in the matter,—or for the purpose of enabling the General Assembly to take such action as would be necessary in case the election was contested. The *prima facie* result of the election would necessarily be known before that time,

as by one of the provisions of this Section the returns of the Man-
agers of election are required to be filed in the offices of the Clerks
of the Courts of the several Counties,—offices which are at all
times open to public inspection.   There is not a word in the Sec-
tion which would either  expressly or by implication convey the
idea that the General Assembly were to *canvass* the returns.   The
Speaker is not directed to open the returns and lay them before the
General Assembly, which might imply that they were to be consid-
ered by that body, and accepted or rejected as they might deter-
mine.   He is not directed to ascertain and publish the *result* of the
returns, but he is simply to "open and publish *them,*"—that is, the
returns, which speak for *themselves;* and if they say that a certain
person has the highest number of votes, then the Constitution steps
in and says that person "shall be Governor."   The Secretary of
State and the Speaker have scarcely more than mere mechanical
acts to perform ; and to say that the omission of these acts of mere
formality, whether proceeding from ignorance, carelessness or from
something worse, can have the effect of defeating the choice of the
people, would be sacrificing the substance to the shadow, and would
be putting a construction on the terms of the Constitution by which
an instrument framed to protect the rights of the people would be
perverted so as to defeat those rights if at any time an officer
should, through ignorance or carelessness or contumacy, fail to per-
form a merely formal act.

The foregoing views are not without the support of authority.  In
*Johnson* vs. *Wilson,* (2 N. H., 202,) Woodbury, J., says: "On gen-
eral principles, the choice of a person to fill an office constitutes the
essence of his appointment. *   *   * After the chcice, if there be a
commission, or an oath of office, or any ceremony or inauguration,
these are forms only, which may or may not be necessary to the
validity of any acts under the appointment, according as usage
and positive statute may or may not render them indispensable."
It is curious to note that this very principle has been practically
recognized and acted upon in this State ever since its reconstruction.
For by the terms of Article III, Section 2, of the Constitution, it is
provided that the Governor "shall be installed during the first
session of the said General Assembly, after his election, *on such day
as shall be provided for by law.*"   As no day for this purpose has
ever yet been provided for. by law, and as Governor after Governor
has been installed and acted without question, this is probably one

of the instances in which Woodbury, J., would say this is a mere form following after the material matter of the election, which usage had rendered not indispensable. (See also *Marbury* vs. *Madison*, 1 Cr., 137; *McBee* vs. *Hoke*, 2 Speer, 138; and *Kottman* vs. *Ayer*, 3 Strob., 92.) If it was supposed that the *prima facie* result, as indicated by an inspection of the returns of the Managers of Election, was not the real and true result of the election, on account of fraud or from any other cause, then the Constitution, as we have seen, provided for contested elections, by which these returns could have been subjected to the most rigid scrutiny. But as this, the only mode provided for in the Constitution by which the returns could have been scrutinized and corrected if found to be in any respect erroneous, was not resorted to, (there being no pretense that any step whatever was taken looking to a contest of the election,) the *prima facie* result must necessarily stand as the correct and legal result of the election. But the Circuit Judge, without deciding the question as to who was "chosen" Governor at the election in November last, has found that neither Chamberlain nor Hampton were "legally installed" as Governor under that election, and therefore concludes that Chamberlain held over under his election in 1874. This renders it necessary for us to inquire, not whether, as the Circuit Judge puts it, Governor Hampton had been legally *installed* as Governor prior to the 20th of December, 1876, for the Constitution is entirely silent as to the *mode* in which the Governor shall be installed, and we are aware of no act of the Legislature prescribing any particular mode of installation, from which it would seem that one mode of installation is quite as legal as any other, but whether, prior to that day, Governor Hampton had "*qualified*" as Governor. For, as we have seen, the Constitution, in Article III, Section 2, does provide that the Governor shall hold his office for two years "and until his successor shall be chosen and *qualified*"—not *installed*.

To determine this question, it is necessary to inquire what is meant by the term " qualified " as used in this Section of the Constitution. The only provision of that instrument which throws any light upon that inquiry is the 20th Section of Article III, which is in these words: " The Governor and Lieutenant Governor, before entering upon the duties of their respective offices, shall take and subscribe the oath of office as prescribed in Article II, Section 30, of the Constitution." This being the only thing required of the

Governor before entering upon the duties of his office, it is difficult to conceive of any other appropriate signification of the word "qualified" than that he shall take the oath of office. What is the object to be attained by requiring the Governor elect to qualify? As he is not required to give bond or do any other act, except to take the oath of office, there can be no other object but to signify his acceptance of the office to which he has been chosen. and to pledge himself, in the most solemn manner, to the performance of its duties. It is conceded that Governor Hampton did, on the 14th December, 1876, take and subscribe the oath of office, as prescribed in the Constitution, and while *all* of the ceremonies usual on such occasions were not observed, owing to the refusal of the Senate to attend as a body, we are aware of no law which makes such ceremonies, although eminently proper and suitable to the diginity of the occasion, *essential* to a legal qualification. It follows, therefore, that Mr. Chamberlain could not successfully claim to hold the office of Governor on the 20th of December, 1876, under the provisions of Article III, Section 2, of the Constitution, as decided by the Circuit Judge, because prior to that time his successor had been "chosen and qualified." The error of the circuit decision may also be made to appear from other considerations growing out of the following state of facts, which are conceded : Mr. Chamberlain was a candidate for re-election at the election held on the 7th November, 1876, and, claiming to have received the highest number of votes, he on the 7th December, 1876, (to use the language of the Circuit Judge,) "assumed to take the official oath prescribed by the Constitution and deliver the address usual upon installation, and from that time has claimed to be Governor by virtue of his last election and installation." Two views of this conduct of Mr. Chamberlain's may be taken : First, That he thereby resigned the office of Governor which he held under the election of 1874. 2d. That by electing to claim the office under the election of 1876, he is estopped, when such claim proves groundless, from falling back upon his right to hold over under the provisions of Article III, Section 2, of the Constitution. There can be no doubt but that a person may resign an office by his acts as fully and completely as by the most formal declaration in words.

The question in such cases is one of intention. What, then, was Mr. Chamberlain's intention, as manifested by his act, in going through the ceremony of inauguration on the 7th. December, 1876,

and asserting his claim to the office of Governor by virtue of the election in November last? His right to hold over ceased the moment his successor was elected and qualified, and this right he could, of course, resign at any moment he saw fit. What does he do? He not only asserts a claim that his successor has been chosen and qualified, but he acts upon such assertion. This he could not do without renouncing or resigning a previous claim so wholly inconsistent that the two could not for a single moment coexist. The moment the intention was formed in his mind to claim the office under the last election, there must necessarily have been an intention to abandon, renounce or resign his claim to hold over, as the existence of one claim necessarily presupposed the non-existence of the other. It is very true that if this intention had remained in the mind of Mr. Chamberlain, unexpressed by any word or act, it would have amounted to nothing. But the moment such intention was expressed by his acts, he as fully and completely resigned his office as if he had done so in the most formal words. It is wholly immaterial that his claim to hold under the last election proved unsuccessful. His resignation resulted from his *assertion* of the claim, and from his *acting* upon such assertion. The moment he asserted his claim to hold under the last election he necessarily thereby asserted that his successor had been chosen and qualified; and when he proceeded to act upon such assertion, he at that very moment, by necessary implication, asserted that he abandoned, renounced or resigned his claim to hold over, because such claim could not possibly exist after his successor was chosen and qualified. It will not do for him to say, after he has discovered that he cannot successfully assert his claim under the last election: "I withdraw my claim and thereby annul my implied resignation." Suppose that Mr. Chamberlain had, in the most formal manner, resigned his former title, under the belief that he was elected at the last election, and that it was necessary for him to resign his former title before he could accept the office under the last election,—could he, upon discovering his mistake, repudiate such resignation and claim that it was null? Surely not. The question in such a case would be, has he resigned? The *reason* which induced him to resign, whether well or ill founded, could not affect the inquiry.

Or, suppose that Mr. Chamberlain, believing himself elected to the United States Senate, had, without any formal resignation of his office of Governor, done such acts as would necessarily imply

an acceptance of the office of Senator, as by receiving his credentials and presenting them to the Senate,—could he, upon being refused admission to a seat in that body upon the ground that he was not really elected, after an absence in Washington of months perhaps, as has been the case in at least one notable instance, come back to South Carolina and claim that he still held the office of Governor, upon the ground that, though he had intended to resign or abandon the office of Governor and take that of Senator, under the belief that he had been legally elected to the latter office, yet, finding he was mistaken, his conduct, which, otherwise, it must be admitted, would have amounted to a resignation, induced by a false hope into which he had deceived himself, ought not to be so regarded, because he had acted under a mistake? The answer certainly would be: "No. If you were induced to resign your office as Governor under the mistaken hope and belief that you had been elected to another office, that is your misfortune; but your mistake and disappointment cannot have the effect of altering the *fact* that you did resign, no matter what was the motive which induced you to do so." This view is supported by the case of *ex parte Gray*, (Bail. Eq., 78,) in which Hunt, upon being defeated by Gray for the office of Commissioner in Equity, at the election held in 1829, refused to surrender the office upon the ground that, under the Constitution and laws of the State, the tenure of that office was during good behavior and not for four years only. The Court of Appeals, per Colcock, J., uses this language: "But if we could support the respondent in his construction of the Acts, and believed that it was the intention of the Legislature, in the first establishment of his office, to put him, in all respects, upon a footing of equality with the then Master in Equity, and that they considered him consequently as holding during good behavior, yet, in this case, I am of opinion that the respondent, by having become a candidate for the office under the terms prescribed by the Act, had voluntarily resigned all right to the first tenure and could not now claim the office." If, however, the conduct of Mr. Chamberlain in claiming the office of Governor under the last election and going through the form of inauguration did not amount to a resignation of the office under the preceding election, the third question still remains, whether Mr. Chamberlain is not thereby estopped from now setting up a claim to hold over under the provisions of Article III, Section 2, of the Constitution of this State. Mr. Bige-

low, in his treatise on estoppel, states the doctrine thus: "A party cannot occupy inconsistent positions; and where one has an election between several inconsistent courses of action, he will be confined to that which he at first adopts. * * * * Any decisive act of the party, done with a knowledge of his rights and of the facts, determines his choice and works an estoppel." Now in this case Mr. Chamberlain had before him two inconsistent courses of action,—so inconsistent that the one was necessarily based upon the assumption that his successor had *not* been "chosen and qualified;" the other, that his successor *had been* "chosen and qualified." With a full knowledge of his rights and of the facts, he does a decisive act, and in the most public and formal manner proclaims to the world the choice which he has made, and, in the language of the writer above quoted, "he must abide by it." The fact that the course of action which he chose did not yield the fruits which he expected can in no way affect the question. The estoppel results from the fact of his having made the choice, and does not depend upon the value of the thing obtained by such choice, or indeed upon whether anything at all was obtained. If it did, this doctrine of estoppel could rarely, if ever, be practically applied. For, if a party got by his choice what he desired and expected, he would not be likely to make any controversy, and, therefore, the question of estoppel could not arise; and if the doctrine is not to be applied because the party did *not* get what he expected and desired by his choice of a course of action, then it is difficult to conceive of any case in which the doctrine would be of any practical importance.

In accordance with the views herein announced, the order reversing the judgment of the Circuit Judge and remanding the prisoner to the custody of the Superintendent of the Penitentiary has heretofore been granted.

*Willard*, C. J., concurred.